LOUIS BERGHOFF, PLAINTIFF IN ERROR, v. THE STATE OF NEBRASKA, DEFENDANT IN ERROR.

Criminal Law: EVIDENCE. Except in cases where it is necessary to show guilty knowledge, it is not admissible to prove that, at another time and place, the accused committed, or attempted to commit, a crime similar to that with which he stands charged. *Cowan v. State*, 22 Neb., 519.

ERROR to the district court for Douglas county. Tried below before HOPEWELL, J.

*Offutt & English*, for plaintiff in error, cited: *Commonwealth v. Jackson*, 132 Mass., 17. *Cowan v. State*, 22 Neb., 525.

*William Leese, Attorney General*, and *E. W. Simeral*, for defendant in error, cited: *Smith v. State*, 17 Neb., 362. *People v. Gray*, 66 California, 271. *Mayer v. People*, 80 N. Y., 364. *Copperman v. State*, 56 N. Y., 592. *Commonwealth v. Eastman*, 1 Cush., 189. *Commonwealth v. Jeffries*, 7 Allen, 548. *People v. Gray*, 66 Cal., 271. *Trogdon v. Commonwealth*, 31 Grattan, 872. *Bielschofsky v. People*, 3 Hun, 40. *Wood v. United States*, 16 Peters, 341.

COBB, J.

The plaintiff in error was informed against in the district court of Douglas county for having, by fraudulent

representations, obtained of the firm of Kirkendall, Jones & Company, of Omaha, certain goods, wares, and merchandise of the value of $397.50. To the information he pleaded *not* guilty, and was tried to a jury, which returned a verdict of *guilty* and found the value of the goods to be more than $35. ·

The plaintiff's motion for a new trial, after verdict, was overruled, and he was sentenced to imprisonment in the state penitentiary for four years.

He brings his cause to this court on error, with nineteen assignments of error at the trial in the court below.

The second is, that the court erred in permitting the state to introduce in evidence the testimony of E. A. Houghton, J. T. Robinson, J. G. Gilmore, Moritz Meyer, and H. J. Moynahan.

It appears from the bill of exceptions that, on the trial, the prosecuting attorney called as a witness E. A. Houghton, who testified that his business was that of wholesale dry goods and notions; that he knew the defendant; that he became acquainted with him about the first of August of last year; that he then had conversation with him. The following questions were then put to the witness by the state.

Q. State whether or not he purchased any goods of your firm? (Which was objected to by the defense, on the ground that it was an attempt to prove by the witness the supposititious fact that defendant, at the time of the inquiry, obtained goods and merchandise of the witness's firm under alleged false pretenses, and on the further ground that the offense cannot be sustained by proving an attempt to commit, or by the commission of other offenses at the time, the testimony, for that reason, being irrelevant, immaterial, and incompetent. The objection was overruled by the observation of the court that, "the testimony is admissible for the purpose of showing the intent of the party charged. I am very confident that the testimony ought .

to be allowed in this case; it is too fine a distinction to be recognized here," and was, therefore, overruled.)

The examination was then continued as follows:

Q. To what firm do you belong?

A. M. E. Smith & Company.

Q. Did the defendant purchase any goods of your firm?

A. Yes, sir.

Q. When?

A. About the 13th of August.

Q. Did you at that time, or prior, have a conversation with defendant?

A. Yes, sir.

Q. When?

A. On Saturday, the 13th of August.

Q. Will you give that conversation?

A. He was introduced to me by one of our traveling men, and said he wanted to buy some goods, but wanted to look up a location first, and that he understood that Shelby, Neb., was a good point, and wanted to go out there and look it over, and if it was satisfactory, he would come back and buy the goods.

Q. Did he say whether not he had been out there?

A. He did not.

Q. What hour of the day was this?

A. Sometime after 12 M. He went on to say then what his assets were, and remarked that he had traded a farm in Michigan for a stock of goods which was there in Michigan, and would be until he had a chance to look up a location, then he would have them shipped to wherever he concluded to locate. He made no remark to me of having $1,000 in money, but said he could pay some cash on the bill. He asked me, further, about the terms, and I told him that unless "A No. 1" references were given and statements were made, we could not fill his order, and if so we preferred to make the terms *thirty* days, and he said he would see. Then he asked if he could go to Shelby

that night and come back and buy his goods on Monday. We referred to a time-table and found he could go out and come in in time to buy his goods and have them shipped on Monday. It was about train time then when he went out of the store, and that was the last I saw of him that day.

Q. Did he buy of you that day?

A. No, sir.

Q. When did you next see him?

A. On the 17th of September.

Q. Did he come into your store then?

A. Yes, sir.

Q. What conversation did you have with him?

A. I had sent him a statement of the bills which were due, and requested the money.

Q. When did he purchase of you?

A. He made a purchase on the 14th of August. I did not see him on that day.

Q. Who was it that sold them?

A. Our traveling man. I did not see him on the 13th, nor until the 17th.

Q. Do you know how much he is indebted to your firm, of your own personal knowledge?

A. Yes, sir. Exactly what was sold him at the time, and at times afterwards.

Q. State how much is now due to your firm?

A. About $929.

Q. What do you value the goods that he bought, altogether?

A. Between $1,400 and $1,500.

Q. How much cash did he pay you?

A. $475 and $5 discount.

Q. He now owes exactly how much?

A. $929.91.

Q. You saw him the next time on the 17th of September?

A. Yes, sir.

Q. Did you have a conversation with him?

A. Yes, sir.

Q. Where did you see him?

A. At our store, in the office, here in the city. I had only made a statement for the thirty days' bill, which was due, and requested the money for it, and he came in on Saturday afternoon, and remarked that he had received the statement, and not knowing exactly how the business was done by the jobbers in this country, he thought he would come in and see me, and explain the matter to me, and said he had not got quite as much money as he expected to have at this time, and that he would pay me $200, and paid me the money in person, and I gave him a receipt; he also asked me if he could have a few more goods, and acted a little nervous about it, and said he was in a hurry; that his folks were coming that afternoon, that he wanted to go out home with them, that he wanted to buy a trunk and have it packed with the goods so that he could take them all along with him. It was then between 2 or 3 P.M. I told him that would be all satisfactory, and hoped before the other thirty days came around that he would be able to square up the account. He said he thought he would from the way his trade was then running. I introduced him to one of our salesmen who sold him about $300 worth of goods. In the meantime he was taken out to another store and a trunk was bought and sent back to our place, and the goods packed in this trunk while he was there, and a wagon was sent with the trunk to the depot in time for the train.

Q. What became of the trunk?

A. I never knew.

Q. Did you get your money for the trunk or goods?

A. No, sir.

Q. What class of goods were they?

A. Some of them were high priced goods, and flannel suitings.

Q. Any silks?

A. A few, but mostly double width flannel suitings, cashmere, and of that description, hosiery and high priced stuff of that kind.

Q. How much money did he pay when he bought the first bill in August?

A. Two hundred and seventy-five dollars in cash and $5 discount.

Q. That would be $275 in cash?

A. Yes, sir.

Q. Did you ever see the defendant from that time until after his arrest?

A. I did not.

Q. Did you ever see any of his goods?

A. Yes, sir.

Q. Where?

A. At Council Bluffs.

Q. Do you know where they were being shipped to?

A. To Grand Forks, Dakota.

Q. Did you see the goods marked?

A. Yes, sir.

Q. How were they marked?

A. They were marked S. Sanberg, Grand Forks, Dakota, when they came to the depot. They were marked after that, S. Sanberg, Centreville, Dakota.

The testimony of Robinson, Gilmore, Meyer, and Sloan was of like character of that detailed. They were severally of as many different firms of wholesale merchants of Omaha, and each was permitted to testify as to conversations and dealings with the defendant at or about the date of the offense, which tended to prove as many separate offenses of the same general character as that charged in the information.

The case of *Cowan v. The State*, 22 Neb., 519, is similar to the case at bar. Cowan was convicted of obtaining money under false pretenses from the First National Bank

of Ord. In delivering the opinion of the court, the then chief justice, MAXWELL, said: "On the trial of the cause the state was permitted to introduce testimony to show that the accused had in two other cases, entirely distinct and separate from that under consideration, obtained goods under false pretenses. This was entirely unauthorized, and could not fail to be prejudicial to the accused. Except in cases where it is necessary to show guilty knowledge, it is not admissible to prove that at another time and place the accused committed, or attempted to commit, a crime similar to that with which he stands charged, as it cannot be expected the accused will be prepared to disprove collateral attacks of this character. The law, therefore, excludes such evidence."

In arriving at this opinion, the court considered most, if not all, the cases wherein the point before us has been discussed, both in England and America, especially those cited by counsel in the brief of either side, as well also the standard text writers. It had not escaped our attention that these cases present a conflict of authority and many irreconcilable propositions. Neither had it been unobserved that the exigencies of many cases had induced courts from time to time to add to the exceptions to the general rule, which confines the prosecution to the proof of the necessary facts to establish the distinct fact charged in the indictment or information. And being substantially without precedent of our own, we conceive it to be the safer course to follow those cases which seem to adhere closest to the principles of the law, and were most conservative of fair and stable practice in the administration of criminal jurisprudence.

The following from Roscoe's Criminal Evidence, 7th Ed., 92, is given as authority for the views expressed: "There are three classes of offenses in which, from the nature of the offense itself, the necessity for this species of evidence is so frequent that they will be considered sepa-

rately. These are—conspiracy, uttering forged instruments and counterfeiting coin, and receiving stolen goods. In these the act itself which is the subject of inquiry is almost always of an equivocal kind, and from which *malus animus* cannot, as in crimes of violence, be presumed; and almost the only evidence which could be adduced to show the guilt of the prisoner would be his conduct on other occasions. Though it must be acknowledged that in the two first of these the crown, being often directly interested, has succeeded in pushing the rules of evidence to their extremest severity against the prisoner."

While it is true that many cases have added to the above that of obtaining goods under false and fraudulent pretenses, and while a class of such, as that of false weights and measures, false metals, paste jewels, *spielmark*, etc., come within the reason of the above, yet cases where the false pretense consists in misrepresentations of the credit, of the means and ability to pay, and the mercantile standing of the accused, do not, in my opinion, come within the reason of the exception. I do not think that the case at bar comes within the reason of any exception to the general rule, that the evidence should be confined to the proof of the offense charged.

The plaintiff is charged (in all the technical terms of the pleader) with unlawfully, willfully, knowingly, and feloniously pretending to one Chas. A. Coe, of the firm of Kirkendall, Jones & Co., of Omaha, that he, Louis P. Berghoff, the plaintiff, was, on the 13th of August, 1887, a member of the firm of I. Linberg & Co., composed of I. Linberg and Louis P. Berghoff, and that his said firm was the owner, and possessed free of incumbrance, of goods, wares, and merchandise of the value of $2,500, which goods, of the value aforesaid, the said Louis P. Berghoff then and there unlawfully and falsely pretended to the said Charles A. Coe, of the firm of Kirkendall, Jones & Co., were *in transit* from the state of Michigan to Shelby, Polk county, Ne-

braska, to be there held and possessed by I. Linberg & Co. for sale in their business, which, said Louis P. Berghoff falsely represented, they were about to permanently establish in Shelby, for sale in the usual course of business, and that said firm of I. Linberg & Co. were possessed of $1,000 cash on hand, as assets for the purposes of their said business, and that the total assets of the firm amounted to $3,500, and that said firm had no liabilities whatever, and was worth the net sum of $3,500, free of all incumbrances, which statement was made by Louis P. Berghoff in behalf of said firm of I. Linberg & Co., for the purpose of obtaining credit of the firm of Kirkendall, Jones & Co., and by means of the false pretenses the said Berghoff, in the name of I. Linberg & Co., unlawfully and feloniously obtained from Kirkendall, Jones & Co., the said firm relying upon the statements and pretenses so made, and believing the same to be true, goods and merchandise of the value of $397.50, of the goods and merchandise of Kirkendall, Jones & Co., with the intent to unlawfully and feloniously cheat and defraud Kirkendall, Jones & Co. of the same and of the value thereof. Whereas the firm of I. Linberg & Co. did not own the goods, wares, and merchandise, or any part thereof, on hand, free of all incumbrance, of the value of $2,500, nor were the same, or any part thereof, in transit from the state of Michigan to Shelby, Polk county, Nebraska, to be there held and possessed by I. Linberg & Co. for sale in their business, or for any other purpose; and, in truth and in fact, the said pretended firm of I. Linberg & Co. did not have, and were not worth, $3,500 over and above their liabilities, and free of incumbrance, and did not have the total assets of the value of $2,500, nor $1,000 in cash, nor were they about to establish a permanent business in Shelby, Polk county, Nebraska, as falsely represented by Louis P. Berghoff, contrary to the statute, etc.

If the accused made the representations to Coe, as

charged, that fact was as susceptible of proof as any other similar fact.   I think he had the right to be convicted of it by evidence coming within the general rules, and not to be called upon to answer to other charges and meet evidence of other distinct offenses, although of a like character.   As said by Justice Devins, in *Commonwealth v. Jackson*, 132 Mass., 16, cited by counsel for plaintiff in error: "Such evidence compels the defendant to meet charges of which the indictment gives him no information, confuses him in his defense, raises a variety of issues, and thus diverts the attention of the jury from the one immediately before it; and, by showing the defendant to have been a knave on other occasions, creates a prejudice which may cause injustice to be done him.   It is a well-settled rule of the criminal law that the general character of the defendant cannot be shown to be bad, unless he shall first attempt to prove it otherwise.   It ought not to be assailed indirectly by proof of misconduct in other transactions, even of a similar description."

In the case of the *Queen v. Oddy*, 5 Cox's C. C., 210, Lord Campbell, in delivering the opinion of the court of criminal appeal, said : "With regard to the admission in evidence of the proof of previous utterings upon indictments for uttering forged notes, I have always thought that those decisions go a great way, and I am by no means inclined to apply them to the criminal law generally; but certainly evidence of that description shows the prisoner skillful in dealing with forged paper, and that may lead to the inference that he knew the particular notes to be forged; but there is no ground upon which, from evidence like this, the *scienter* can be inferred upon a charge of feloniously receiving stolen goods."

Following the decision in the case of *Cowan v. The State*, *supra*, I am of the opinion that the district court erred in admitting the evidence excepted to in the second assignment, and as there must be a new trial, the other errors assigned will not be further considered.

The judgment of the district court is reversed, and the cause is remanded for further proceedings in accordance with law.

REVERSED AND REMANDED.

THE other judges concur.